FILED _____ ENTERED
LOGGED _____ RECEIVED

LJW/DEH: USAO#2019R00430

SEP 1 0 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** CCB-19-0431 |
| | * | |
| **CARMINE VIGNOLA,** | * | **(False Declarations Before a Grand** |
| | * | **Jury, 18 U.S.C. § 1623(a))** |
| **Defendant.** | * | |
| | * | |
| | * | |
| | * | |
| | ****** | |

## INFORMATION

The United States Attorney for the District of Maryland charges that:

### COUNT ONE
### (False Declarations Before a Grand Jury)

#### Introduction

1. The Baltimore Police Department ("BPD") is an agency of the State of Maryland whose

   law enforcement jurisdiction includes Maryland's largest city, Baltimore.

2. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of

   Ethics, which provides, in pertinent part:

   > As a Law Enforcement Officer, my fundamental duty is to serve the
   > community; to safeguard lives and property; to protect the innocent
   > against deception, the weak against oppression or intimidation; the
   > peaceful against violence or disorder; and to respect the
   > constitutional rights of all to liberty, equality and justice. Honest in
   > thought and deed both in my personal and official life, I will be
   > exemplary in obeying the law and the regulations of my department
   > … I recognize the badge of my office as a symbol of public faith
   > and I accept it as a public trust to be held so long as I am true to the
   > ethics of police service.

3. CARMINE VIGNOLA ('VIGNOLA") joined the BPD on September 4, 2007, and became a police officer on July 25, 2008.  VIGNOLA was promoted to Detective on March 20, 2014.

4. In March 2014, VIGNOLA served on a Special Enforcement Section (SES) unit assigned to BPD's Western District.  Officer 1 was VIGNOLA's partner in the SES unit. Sergeant K.G. was the officer-in-charge of the SES unit.

**March 26, 2014, Gun Planting**

5. On the evening of March 26, 2014, VIGNOLA, who was on duty, was having dinner with K.G. at a restaurant in Baltimore.  K.G. received a call on his cell phone from Detective W.J.

6. W.J. had just deliberately run over an arrestee, D.S., in the front yard of a home in Northeast Baltimore.

7. K.G. asked VIGNOLA if he had a BB gun.  VIGNOLA told him he did not.  K.G. asked VIGNOLA to call Officer 1, VIGNOLA's partner, to ask him if he had a BB gun.

8. VIGNOLA then called Officer 1, who was not working that day, and learned that he had a BB gun at his home.

9. K.G. and VIGNOLA then drove to Officer 1's home and retrieved the BB gun.

10. VIGNOLA understood that K.G. retrieved the BB gun so that K.G. could plant it at the scene of D.S.'s arrest in an attempt to justify W.J. running D.S. over.

11. K.G. and VIGNOLA then drove to the site of D.S.'s arrest on Anntana Avenue and Bel Air Road in Northeast Baltimore City.

12. Once there, K.G. exited the vehicle and headed toward the scene of the accident. VIGNOLA exited the vehicle but remained near it. K.G. subsequently returned to the car, without the BB gun, and he and VIGNOLA left the scene.

13. D.S. was taken from the scene to the hospital, in custody, where drugs were recovered from him. He was then taken from the hospital to BPD's Central Booking where he was charged. Those charges included possession, use and discharge of a gas or pellet gun, for the BB gun that K.G. planted at the scene of D.S.'s arrest, and a number of drug offenses.

14. D.S. was detained on those charges until at least April 2, 2014.

15. The charges against D.S. arising out of his arrest on March 26, 2014, were disposed of by *nolle prosequi*, which is a form of dismissal, on January 16, 2015.

## March 1, 2017, Arrests of the Members of the Gun Trace Task Force

16. On March 1, 2017, W.J. and six other officers who had been members of the BPD's Gun Trace Task Force ("GTTF") were arrested on federal racketeering charges. Thereafter, it became public that multiple GTTF defendants were cooperating and providing information to the United States in an ongoing investigation.

## January 2018 Meeting at the YMCA Pool

17. In January 2018, VIGNOLA and K.G. arranged to meet in person. In order to avoid detection, they arranged the meeting using their wives' cell phones.

18. VIGNOLA went to the YMCA near K.G.'s home in Pennsylvania. K.G. had arranged to meet in the swimming pool to ensure that VIGNOLA did not have a recording device on him. Once K.G. and VIGNOLA were in the swimming pool, VIGNOLA asked K.G. words to the effect of, "do you have anything to worry about now, you know, since

[W.J.] was arrested, do you have any concerns?"   K.G. responded that the only thing he

was worried about was the incident on "Bel Air Road," which was a reference to the

arrest of D.S.   K.G. told VIGNOLA that if he was brought in for questioning by federal

law enforcement or prosecutors who had investigated the GTTF, that VIGNOLA should

tell them that he, VIGNOLA, was not there, which they both knew was not true.   When

VIGNOLA said he had been seen by another officer at the scene, K.G. told him to say

that they were there for "scene assessment" or words to that effect, which was also not

true because they did not provide any "scene assessment."   VIGNOLA then asked K.G.,

"what about [Officer 1]," referring to the fact that Officer 1 knew they had obtained the

gun from him.   K.G. then told VIGNOLA to tell law enforcement that he, K.G., had

taken the gun from his, K.G.'s, trunk, which was also not true, since K.G. and VIGNOLA

had obtained the gun from Officer 1.


**February 13, 2019, Appearance Before the Grand Jury**

19. On February 13, 2019, VIGNOLA testified before a federal Grand Jury sitting in

    Baltimore that was investigating allegations that the BB gun recovered at the scene of

    D.S.'s arrest had been planted there by law enforcement.   VIGNOLA had previously

    testified under oath during his career as a police officer on numerous occasions.

20. VIGNOLA was duly sworn by the Foreperson of the Grand Jury before he was asked any

    questions.

21. VIGNOLA was then given the following advisements, asked the following questions by

    the prosecutor and gave the following answers:

Q.  Detective Vignola, you've been subpoenaed to testify before a special federal grand jury that's investigating allegations of violations of federal criminal law.  Do you understand that?

A.  I do.

Q.  You've just been given an oath by the foreperson and have promised to testify truthfully,  Do you understand that?

A.  I do.

Q.  If you should lie or knowingly withhold information, you could be charged with the crimes of perjury or making a false statement, and if convicted be imprisoned.  Do you understand that?

A.  I do.

Q.  You have the right to be represented by counsel in these proceedings, although your counsel cannot come with you into the grand jury room.  I understand you have counsel with you here today who is outside the grand jury; is that correct?

A.  Yes.

Q.  If at any time you want to stop and consult with your counsel, you can do that.  You just have to let me know that that's something you'd like to do, okay?

A.  Yes.

22.  VIGNOLA was then asked a series of questions by the prosecutor about the events of

March 26, 2014.

23.  At the end of his testimony, VIGNOLA was given the following admonishment by the

prosecutor:

[PROSECUTOR].   Any other questions for Detective Vignola?

Seeing none, sir, after today if you realize anything you've said is incorrect or incomplete, you could be given the chance to come back and correct the record or add to it, but you have to communicate that to your attorney, [], who will then communicate it to myself or [another prosecutor], and we will schedule another appearance before the grand jury for you. Do you understand that?

WITNESS. Yes.

24. Thereafter, at no time did VIGNOLA ask to return to the Grand Jury.

### The Charge

25. On or about February 13, 2019, in the District of Maryland, the defendant,

### CARMINE VIGNOLA,

while under oath and testifying in a proceeding before a Grand Jury of the United States in the District of Maryland, knowingly did make a false material declaration, that is to say: VIGNOLA testified that he called his partner, Officer 1, and asked him if had a BB gun and that Officer 1 said he did not; VIGNOLA further testified that he and K.G. went directly from the restaurant where they were eating to the scene of D.S.'s arrest; VIGNOLA further testified that he saw K.G. go to the trunk of his car after VIGNOLA told K.G. that Officer 1 did not have a BB gun.

26. At the time and place aforesaid the Grand Jury was conducting an investigation to determine whether violations of Title 18, United States Code, Sections 371, 1512(b)(3) and 1519 had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations. Specifically, the Grand Jury was investigating whether a BB gun had been planted at the scene of D.S.'s arrest on March 26, 2014. It was material to said investigation that the Grand Jury ascertain if a

BB gun had been obtained by K.G., VIGNOLA, Officer 1 or anyone else who was at the scene of D.S.'s arrest on March 26, 2014.

27. At the time and place alleged, VIGNOLA, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions with respect to the material matter alleged above as follows:

A.   [Sergeant K.G.]-- he wanted me to ask [Officer 1] if he had a BB gun.

Q.   All right.  Did you do that?

A.   I did.

Q.   And did you get your partner, [Officer 1], on the phone?

A.   I did.

Q.   And what happened?

A.   He said, no.

Q.   Okay.

A.   At that -- would you like me to --

Q.   And then what happened -- yeah.

A.   At that time --

Q.   Did you call him from the restaurant?  Are you still in the restaurant?

A.   Yes, still in the restaurant.

Q.   Okay.

A.   At that time, K.G. gets up, walks out of the restaurant –

Q.   This is for the second time?

A.   For the second time.

Q.   Okay.  And where does he go?

A.   He goes across the street where our vehicle, that we were driving that evening, is parked.  I see him open the trunk, then I see him close the trunk.  He comes back inside the restaurant and tells me we have to go.

Q.   Did you see him do something in the trunk, or what could you see in terms of, from your vantage point, was going at the trunk?

A.   So it was dark that evening and I believe he was wearing a dark coat.  I couldn't see him enter the trunk, but I saw him walk over to the trunk, open it and then close it.

Q.   Okay.  Did he lean into it?  Did you see anything like that?

A.   No, I did not see him lean into it.

Q.   You testified he came back and said you had to go; is that right?

A.   Yes.

Q.   All right.  And then what happened?

A.   So then we leave the restaurant.  He starts driving at a high rate of speed.  He tells me that [W.J.] had just hit somebody with a vehicle.

Q.   Where are you going?

A.   He told me [W.J.] hit somebody with a vehicle off of Belair Road.

Q.   All right.  And is that where you're headed now?

A.  Yes.  I believe we were heading up Belair Road at the time.

Q.  You said at a high speed?

A.  Yes.

Q.  Now, you testified that he had previously asked you if you had a BB gun, and then asked you to call [Officer 1] to see if he had a BB gun, correct?

A.  Yes.

Q.  In the car, what did you think was happening, I guess, at the latest after he told you that [W.J.] had hit someone and you're now driving at high speeds to the scene?

A.  Well, prior to that I was confused about the situation.  When he told me that [W.J.] had hit somebody with the vehicle, I was, at that point, under suspicion that he was looking for a BB gun to plant as evidence.

Q.  Where?

A.  In the crime scene on the person.  I wasn't sure at that time.

Q.  Did you believe that's why you were heading there at high speed so that he could do that?

A.  Yes.

Q.  So what happened next?

A.  At that point, we arrived at the crime scene.  We get out of the vehicle –

28. Later, VIGNOLA was asked the following series of questions by a member of the Grand

Jury and gave the following answers:

GRAND JUROR.  From the time that you were asked to call your partner for the BB gun, till when you guys left the restaurant to go

up to the scene, do you recall what that time frame was, how much time passed?

WITNESS.   No.  I can't give you a specific time frame.  That was -- like I said, that was 5 years ago.  We were going at a fast rate of speed on the way up there.

GRAND JUROR.   Was it a relatively short period of time that he asked you about the BB gun and then said, all right, we got to go?  You said he stepped out again.

WITNESS.   Yeah.  Yeah, so that was -- it might have been within the span of, this is a guesstimate, maybe 2, 3 minutes, like, the whole thing unfurling, and then him telling me we have to go.

GRAND JUROR.   So you didn't finish your meal.  It was, do you know anybody with a toy BB gun, call your partner, he steps out, comes back in, all right, we've got to go?

WITNESS.   Yes.

GRAND JUROR.   Were you and your partner close?

WITNESS.   Yes.

GRAND JUROR.   Were you and your sergeant close, too?

WITNESS.   Yes.

GRAND JUROR.   So it wasn't weird for -- did you feel weird that he asked you that question?

WITNESS.   Yeah.  So when he first asked me for a BB gun, I was under the assumption -- he asked me if I owned a BB gun.  I said, no.  If I personally had a BB gun.  I said, no, and then he asked me to call my partner, Rob, which was, you know, I thought very unusual.

GRAND JUROR.   But you still called him and asked him if he had it?

WITNESS.   Yes.  I was ordered by my sergeant to give my
partner a call.

29. The aforesaid underscored testimony of VIGNOLA, as he then and there well knew and

believed, was false in that, when VIGNOLA called Officer 1 and asked Officer 1 if he

had a BB gun, Officer 1 responded that he did and VIGNOLA and Sergeant K.G. then

went to Officer 1's home and obtained the BB gun before driving to the scene of D.S.'s

arrest on Bel Air Road.

18 U.S.C. 1623.

Date:   September 10, 2019

Robert K. Hur
United States Attorney

- 11 -